IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YASMINE AL-MALIKI, | ) | CASE NO.  1:23-CV-00593-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Yasmine Al-Maliki ("Plaintiff" or "Al-Maliki"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In September 2020, Al-Maliki filed an application for POD, DIB, and SSI, alleging a disability onset date of September 1, 2018, and claiming she was disabled due to bipolar disorder, depression, cognitive behavior control, anger management issues, and impulse control issues.  (Transcript ("Tr.") at 25, 95.)  The applications were denied initially and upon reconsideration, and Al-Maliki requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 25.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On January 5, 2022, an ALJ held a hearing, during which Al-Maliki, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 25.)  On January 28, 2022, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 25-37.)  The ALJ' s decision became final on February 1, 2023, when the Appeals Council declined further review.  (*Id.* at 10-16.)

On March 21, 2023, Al-Maliki filed her Complaint to challenge the Commissioner's final decision (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 12.)  Al-Maliki asserts the following assignments of error:

(1) The ALJ erred in his evaluation of the treating psychologists's [sic] opinion and, further, failed to build a logical bridge between the other opinion evidence and his assessment of RFC.

(2) The plaintiff's severe mental impairments meet Listings 12.04 and 12.08.

(3) The ALJ's assessment of residual functional capacity is not supported by substantial evidence.

(Doc. No. 9.)

## II.      EVIDENCE

### A.      Personal and Vocational Evidence

Al-Maliki was born in August 1995 and was 26 years-old at the time of her administrative hearing (Tr. 36, 48), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education.  (Tr. 36.)  She has past relevant work as a yard laborer/material handler.  (*Id.*)

### B.      Relevant Medical Evidence[2]

On December 31, 2020, Al-Maliki met with Sheerli Ratner, Ph. D., for a mental health assessment. (*Id.* at 452-54.)  Al-Maliki reported feeling overwhelmed.  (*Id.* at 454.)  She told Dr. Ratner she had taken

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Al-Maliki only challenges the ALJ's mental findings regarding her mental impairments, the Court further limits its discussion of the evidence to Al-Maliki's mental impairments.

her daughter to the doctor and the doctor called children's services.  (*Id.*)  Al-Maliki reported feeling anxious sitting at the doctor for three hours and thought maybe it was her communication that caused people to treat her a certain way.  (*Id.*)  Al-Maliki told Dr. Ratner she wanted to make herself stable but couldn't, and Dr. Ratner noted "(temper – attitude in court)."  (*Id.*)  Al-Maliki endorsed problems with relationships.  (*Id.*)  On examination, Dr. Ratner found Al-Maliki adequately groomed and fully oriented, with sustained concentration, cooperative behavior, depressed mood, congruent affect, normal speech, logical thought process, and fair insight and judgment.  (*Id.* at 457.)  Dr. Ratner noted Al-Maliki presented "with symptoms of Major Depressive Disorder including anhedonia, apathy, fatigue, feelings of worthlessness, guilt and anger."  (*Id.*)  Dr. Ratner diagnosed Al-Maliki with major depression.  (*Id.* at 458.)

On January 5, 2021, Al-Maliki saw Deborah Koricke, Ph.D., for a consultative psychological evaluation.  (*Id.* at 463.)  Al-Maliki reported living alone in a single-family home and seeing her seven-year-old daughter every other weekend.  (*Id.* at 464.)  She lost custody of her daughter several years ago after being convicted of domestic violence against the child's father twice.  (*Id.*)  Al-Malike reported she has held numerous jobs but usually gets fired because of arguing with bosses or not showing up.  (*Id.*)  Her last job was in February 2020.  (*Id.*)  She worked for about a month before the employer cut her hours.  (*Id.*)  She felt they were letting her go, so she stopped going to work.  (*Id.*)  She has done this many times.  (*Id.*)  Al-Maliki reported she was seeking work but told Dr. Koricke she got bored very easily.  (*Id.*)  She denied any psychiatric hospitalizations but had gotten in a lot of trouble as a juvenile for hitting her mother and having unruly charges.  (*Id.* at 465.)  She had been mandated to attend anger management and other counseling multiple times.  (*Id.*)  Al-Maliki last saw a psychologist in December 2020.  (*Id.*)  The psychologist told her to come back when she wanted, but Al-Maliki had not scheduled anything.  (*Id.*)  Dr. Koricke noted Al-Maliki "was rather upset the psychologist did not reschedule her automatically," and

3

so Al-Maliki was unsure about calling for another appointment.  (*Id.*)  She reported she had yelled at many people and threatened to hurt them but had "not attacked too many people since high school."  (*Id.*)  Al-Maliki lived in an apartment by herself that her mother paid for because they had a lot of problems getting along.  (*Id.*)  She could drive a car.  (*Id.*)  She reported "'lots of wild mood swings'" but denied anxiety, panic attacks, and manic symptoms.  (*Id.* at 466.)  Her mother came to help her clean, but Al-Maliki could dress, bathe, and groom herself.  (*Id.* at 468.)  She could do all her chores and care for her daughter every other weekend.  (*Id.*)  She regularly socialized with her friends and others without problems.  (*Id.*)  She kept herself busy using social media, watching TV, and listening to music.  (*Id.*)

On examination, Dr. Koricke found Al-Maliki's clothes neat and clean, and she had good hygiene and normal motor behavior.  (*Id.* at 467.)  Al-Maliki demonstrated appropriate eye contact, normal speech, coherent and goal-directed thought process, a slightly agitated affect (although she calmed down when Dr. Koricke used neutral language toward her), neutral mood, and full orientation.  (*Id.*)  Al-Maliki denied any problems with concentration unless she was bored.  (*Id.*)  She performed serial sevens correctly, recalled three out of three objects immediately and three out of three objects after a five-minute delay, and she recalled six digits forward and five digits backward.  (*Id.* at 467-68.)  Dr. Koricke diagnosed Al-Maliki with unspecified personality disorder with narcissistic, antisocial, and histrionic features and unspecified depressive disorder.  (*Id.* at 468.)  Dr. Koricke opined that if Al-Maliki was interested in a task, she could maintain attention, concentration, persistence, and pace.  (*Id.* at 469.)  She retained the ability to do simple and multi-step tasks.  (*Id.* at 469-70.)  Dr. Koricke noted Al-Maliki had "a negative attitude toward supervision and is antagonistic and critical"; while Al-Maliki reported being terminated from a few jobs, "it has mainly been for failure to show up or call in."  (*Id.* at 470.)  Dr. Koricke opined that Al-Maliki "was able to respond appropriately to work pressures in a work setting, although she is not very interested in working at the sorts of unskilled jobs which unfortunately are all she can qualify for at this time."  (*Id.*)

4

On March 9, 2021, Al-Maliki saw Dr. Ratner for follow up.  (*Id.* at 653-55.)  Al-Maliki reported being "reactive" for as long as she could remember, and that when she was little, she got stressed out by things that happened to her.  (*Id.* at 655.)  Al-Maliki denied having a bad childhood and was unsure why she was the way she was.  (*Id.*)  On examination, Dr. Ratner found Al-Maliki adequately groomed with cooperative behavior, full orientation, normal speech, logical and organized thought process, tight association, fair judgment and insight, normal memory, sustained attention and concentration, appropriate language, an "okay" fund of knowledge, depressed mood, and a full range of affect.  (*Id.* at 656.)  Dr. Ratner noted Al-Maliki remained depressed.  (*Id.*)  Al-Maliki was to schedule her next appointment.  (*Id.* at 657.)

On March 24, 2021, Dr. Ratner completed a Medical Source Statement – Mental Capacity form. (*Id.* at 479-80.)  Dr. Ratner opined Al-Maliki was extremely limited in the following areas: handling conflicts with others; responding to requests, suggestions, criticism, correction and challenges; keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; responding to demands; adapting to changes; and managing one's psychologically based symptoms. (*Id.*)  Dr. Ratner further opined Al-Maliki was markedly limited in the following areas: recognizing a mistake and correcting it; identifying and solving problems; cooperating with others; asking for help when needed; stating her own point of view; distinguishing between acceptable and unacceptable work performance; setting realistic goals; understanding and responding to social cues; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full work day without needing more than the allotted number or length of rest periods during the day.  (*Id.*) Dr. Ratner identified major depression, including social isolation, fatigue, lack of concentration, and mood instability, as the diagnosis and  findings that supported her opinion.  (*Id.* at 480.)

On April 15, 2021, Al-Maliki saw Dr. Ratner for follow up.  (*Id.* at 669-71.)  Al-Maliki reported

5

"distress regarding racing thoughts." (*Id.* at 671.)  On examination, Dr. Ratner found Al-Maliki adequately groomed with cooperative behavior, full orientation, normal speech, logical and organized thought process, tight association, poor judgment and insight, normal memory, sustained attention and concentration, appropriate language, an "okay" fund of knowledge, depressed mood, and a full range of affect. (*Id.* at 672.)  Dr. Ratner noted Al-Maliki remained depressed. (*Id.*)  Al-Maliki was to schedule her next appointment. (*Id.* at 673.)

On April 22, 2021, Al-Maliki saw Antionette Abou Hadar, M.D., for a routine physical examination and brought disability paperwork to be completed. (*Id.* at 623.)  Al-Maliki reported mood disorder as the reason for disability. (*Id.*)  Al-Maliki told Dr. Abou Hadar she was on Cymbalta and received counseling. (*Id.*)  Al-Maliki endorsed mood swings consisting of depression, anger, and happiness. (*Id.*)  Al-Maliki stated she had stopped taking Cymbalta because she couldn't eat, and it caused vomiting. (*Id.*)  Dr. Abou Hadar noted normal examination findings. (*Id.* at 626.)  Dr. Abou Hadar could not rule out bipolar disorder and suggested Al-Maliki try Cymbalta again. (*Id.*)  If Al-Maliki could not tolerate it, her primary care physician could switch therapies. (*Id.*)

On July 13, 2021, Al-Maliki saw Dr. Ratner for follow up and reported "distress" regarding a recent trip she had taken to Disney. (*Id.* at 723.)  Al-Maliki told Dr. Ratner the whole experience was stressful, and her phone had died at Disney. (*Id.*)  On examination, Dr. Ratner found cooperative behavior, full orientation, normal speech, a logical and organized thought process, fair judgment and insight, normal memory, an "okay" fund of knowledge, depressed mood, and a full range of affect. (*Id.* at 724.)  Dr. Ratner noted Al-Maliki remained depressed and Al-Maliki was to schedule her next appointment. (*Id.* at 724-25.)

On October 26, 2021, Dr. Ratner completed a second mental capacity medical source statement. (*Id.* at 728-29.)  Dr. Ratner opined Al-Maliki was extremely limited in the following areas: handling conflicts

6

with others; responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. (*Id.*) Dr. Ratner further opined Al-Maliki had marked limitations in the following areas: cooperating with others; ignoring or avoiding distractions while working; working closely to or with others without interrupting or distracting them; adapting to changes; and managing one's psychologically based symptoms. (*Id.*) Dr. Ratner noted she had been treating Al-Maliki since June 2014. (*Id.* at 729.) Dr. Ratner identified major depression, irritability, lack of focus, social anxiety, and avoidance as the diagnosis and medical and clinical findings supporting her opinion. (*Id.*)

**C.      State Agency Reports**

On January 19, 2021, Leslie Rudy, Ph.D., reviewed the file and opined Al-Maliki had no limitation in her ability to understand, remember or apply information, but had a marked limitation in her ability to interact with others and moderate limitations in her ability to concentrate, persist, or maintain pace and adapt or manage herself. (*Id.* at 97-98, 105-06.) Dr. Rudy further opined Al-Maliki could carry out one to four step tasks in a setting without demands for unusually fast pace or high production. (*Id.* at 99, 108.) Al-Maliki retained the capacity for occasional and superficial interactions with supervisors and coworkers in a non-public setting and could not tolerate close, over-the-shoulder supervision. (*Id.* at 100, 108.) Al-Maliki retained the capacity to adjust to minor and infrequent changes in a work setting. (*Id.*)

On June 3, 2021, on reconsideration, Janet Souder, Psy.D., affirmed Dr. Rudy's findings. (*Id.* at 116-17, 118-19, 125-26, 127-28.)

**D.      Hearing Testimony**

During the January 5, 2022 hearing, Al-Maliki testified to the following:

- She lives with her mom. (*Id.* at 48.) She has an eight-year-old daughter. (*Id.* at 49.) She shares custody with the child's father. (*Id.*) There are days and nights where her daughter stays with her. (*Id.*)

- She cannot work because she has a "people problem" that gets her in trouble. (*Id.* at 52.) She cannot have normal relationships with anyone; not at work, not at home, not in her personal life, and not with her child. (*Id.*) She sees a counselor and is trying to fix it, but it isn't working. (*Id.*) She tries to function, but it isn't working. (*Id.*) She goes out with family and friends, and when she gets triggered or upset, she reacts. (*Id.* at 53.) Sometimes she reacts physically, sometimes verbally, but it's not good. (*Id.*) There is nothing she can do about it while it is happening. (*Id.*) She is aware of it after the fact. (*Id.*) Sometimes she wakes up like that or something happens and ruins how she deals with every situation. (*Id.*) She is working to do better in controlling it. (*Id.*) She has been seeing her counselor since she was a teenager and wants to keep seeing her. (*Id.* at 53-54.) Her primary care doctor wants her to see someone else since her counselor cannot prescribe medication. (*Id.* at 54.) She tries to relax, but it doesn't work, and that's why they're trying to give her different medication. (*Id.*) She cannot focus on one thing. (*Id.*) She never completes anything. (*Id.*)

- She gets violent. (*Id.*) She breaks all kinds of things. (*Id.* at 57.) She doesn't get to see her daughter every day, so she is trying to work through it. (*Id.*) If she could deal with it, she wouldn't be in this situation. (*Id.*) She is not nice and does mean stuff and then feels bad. (*Id.*) She has bad road rage. (*Id.* at 60.) She has gotten out of her car at times, and she has had people chase her in their cars to where she thought they were going to shoot her or run into her car. (*Id.*) She has issues with cashiers and people at drive throughs. (*Id.*) She has problems with authority. (*Id.*) She doesn't like when she feels like they are picking on her or singling her out. (*Id.*) She cannot stop herself from reacting or from leaving the job. (*Id.*) She hit her child's father in court. (*Id.* at 61.) Not knowing how to react in the moment has caused her a lot of problems. (*Id.*)

- She takes Cymbalta but they are trying to give her a different medication because she does not like how it makes her feel. (*Id.* at 55.) She gets away from people when she can, but she can't when she is at work or with her child or her family. (*Id.*) When she reacts, she is not thinking about how to calm down. (*Id.*) Her adrenaline is racing, and she feels like her head is bursting. (*Id.* at 56.) She is not thinking about the consequences or anyone else's feelings. (*Id.*) The last time this happened was yesterday. (*Id.*) It happens a lot during a week. (*Id.*) It happens more than once a day. (*Id.*)

- She has gone to anger management and counseling. (*Id.* at 57.) She has taken numerous anger management classes in her life. (*Id.*) She last took anger management classes three or four years ago when her child's father took her to court. (*Id.*)

- She has been fired from jobs before. (*Id.* at 58.) She was fired from one place for arguing with her boss. (*Id.*) He called the police on her but did not press charges. (*Id.*)

8

- She would not have a hard time understanding what she was being told when learning how to do a job. (*Id.*) She does not have any short-term memory issues, but she has issues with her long-term memory. (*Id.* at 59.)

- She cooks sometimes. (*Id.*) She usually cooks when she has her daughter. (*Id.*) Other than that, her mom cooks or they order takeout. (*Id.*) Her mom does the laundry, shopping, and other chores. (*Id.*)

The VE testified Al-Maliki had past work as a yard laborer/material handler. (*Id.* at 62-63.) The ALJ then posed the following hypothetical question:

> I'd like you to assume a hypothetical individual with the job that you described. I'd like you to further assume that this individual could work at all exertional levels. They can understand, remember, and carry out simple instructions in a routine work setting with few minor changes and can respond appropriately to supervisors, coworkers in work situations, if the tasks performed are goal-oriented, but not at a production-rate pace. The work does not require more than superficial interaction, being that is does not require negotiating with, instructing, persuading, or directing the work of others. And the occupation does not require tandem work or interaction with the public. Could this person perform Ms. Al Maliki's past work?

(*Id.* at 63.)

The VE testified the hypothetical individual would not be able to perform Al-Maliki's past work as a yard laborer/material handler. (*Id.* at 64.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as machine packager, floor waxer, and groundskeeper. (*Id.*)

Counsel for Al-Maliki asked whether there would be any jobs for an individual who needed to be in a work environment where they could perform the job in isolation. (*Id.* at 66.) The VE testified there were no unskilled occupations performed in physical isolation from others. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

9

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment

10

does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Al-Maliki was insured on her alleged disability onset date, September 1, 2018, and remains insured through December 31, 2023, her date last insured ("DLI"). (Tr. 25-26.) Therefore, in order to be entitled to POD and DIB, Al-Maliki must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since September 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: personality disorder and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple instructions in a routine work setting with few, minor changes; and can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require tandem work or interaction with the public.

6. The claimant is unable to perform any past work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on August **, 1995 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 28-37.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

13

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Listing Argument

Al-Maliki argues the ALJ "erred in evaluating the evidence regarding [her] ability to adapt and manage her own mental health symptoms." (Doc. No. 9 at 14.) She asserts that substantial evidence supports the determination that she has marked limitations in interacting with others and adapting or managing herself, and therefore she should have been found to meet Listings 12.04 and 12.08. (*Id.*) Al-Maliki maintains that the ALJ's evaluation of her ability to adapt and manage herself "is devoid of any actual analysis of this evidence in light of the actual requirements and definition of this domain." (*Id.* at 16.) Al-Maliki argues that the evidence considered by the ALJ in evaluating this domain "is not the emphasis of the domain at issue." (*Id.*) Al-Maliki asserts the ALJ "ignored the consistent and substantial evidence of record and testimony documenting ongoing reactive mood, anger control difficulties, and a lack of stability" in finding a moderate limitation in her ability to adapt or manage herself. (*Id.* at 17.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Al-Maliki did not meet Listings 12.04 and 12.08. (Doc. No. 12 at 8.) First, to the extent Al-Maliki argues it was error for the ALJ to consider evidence that she was often properly groomed or had proper hygiene in evaluating the domain of adapting or managing oneself, Al-Maliki is mistaken, as "the regulation specifically cites such evidence as relevant to this criterion." (*Id.* at 10) (citing 20 CFR 404, Subpart P, Appendix 1, § 12.00E(4). Second, reading the ALJ's decision as a whole, as the Court must do, "the ALJ

identified additional evidence that would support his finding of no greater than moderate limitation in the area of adapting or managing oneself." (*Id.* at 10-11.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 40.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed

15

Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Listings 12.04 and 12.08 contain the following criteria: (i) "paragraph A" criteria, impairment-related symptoms; (ii) "paragraph B" criteria, impairment-related limitations; and (iii) "paragraph C" criteria, additional functional criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A, 12.06, 12.08. A claimant can meet the requirements of this Listing only if she satisfies either: (1) the criteria of both paragraphs A and B; or (2) the criteria of paragraph C.  *See Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017). Al-Maliki focuses her arguments on the "paragraph B" criteria.  (Doc. No. 9 at 15-17.)

In order to satisfy the "paragraph B" criteria of Listings 12.04 and 12.08, Al-Maliki must exhibit "marked" or "extreme" functional limitations in two or more of the following categories: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A(2)(b), 12.04, 12.08. To establish a "marked" limitation in any of these areas, a claimant's ability to function "independently, appropriately, effectively, and on a sustained basis" must be seriously limited. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(d). To establish an extreme limitation in any of these areas, a claimant must not be able to function in this area "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(e).  The regulations explain the domain of adapt or manage oneself as follows:

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting;

16

and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E(4).

At Step Two, the ALJ found that Al-Maliki's personality disorder and depressive disorder were severe impairments. (Tr. 28.) At Step Three, the ALJ expressly stated that he considered Listings 12.04 and 12.08, and addressed the criteria for those listings as follows:

> In understanding, remembering, or applying information, the claimant has no limitations. The claimant did not allege any particular issues in this area. Additionally, the claimant also stated that she could perform simple maintenance, pay bills, and drive. In addition, the record shows that the claimant exhibited intact short-term and long-term memory (C4E, C7F/24-29, C7F/40- 45, C10F/31-37).
>
> In interacting with others, the claimant has marked limitations. Here, the claimant alleged that she has difficulty engaging in social activities, getting along with others, and dealing appropriately with authority. However, according to her statements, the claimant is also able to shop in stores. Finally, the medical evidence shows that the claimant was described as cooperative (C4E, C2F/70-77, C6F/143-149, C7F/24-29, C7F/40-45, C10F/31-37).
>
> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that she has limitations in concentrating generally and completing tasks. On the other hand, the claimant said that she is also able to prepare simple meals and watch television. Additionally, the record reflects findings of sustained attention span and concentration as well as a logical and organized thought process (C4E, C2F/70-77, C3F, C7F/24-29, C7F/40-45, C10F/31-37).
>
> Finally, the claimant has moderate limitations in her ability to adapt or manage herself. The claimant asserted that she has difficulties handling change and managing her mood. That said, the claimant also stated that she is able to handle self-care and personal hygiene. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, normal behavior, and full range of affect (C4E, C2F/70-77, C3F, C7F/24-29, C7F/40-45, C10F/31-37).
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

17

(*Id.* at 29-30.)

In the RFC analysis, the ALJ further found as follows:

Therefore, the evidence reflects that the claimant experienced limiting signs and symptoms associated with her severe impairments. She received treatment, to include psychotherapy and medication management, for reported psychological symptoms that included anxiety, feeling overwhelmed, managing life stressors, issues with anger management/impulse controls, a history of behavior problems in school, feeling easily stressed, racing thoughts, and mood swings (C2F/70-77, C3F, C6F/143-149, C7F/24-29, C7F/40-45, C7F/55-56). Significant related clinical findings included a depressed mood, a depressed or agitated affect, and impaired insight and judgment (C2F/70-77, C3F, C7F/24-29, C7F/40-45, C10F/31-37). However, the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the level of limitation alleged is not altogether supported by the objective findings. She presented as cooperative upon examination, and her short-term and long-term memory were intact (C2F/70-77, C6F/143-149, C7F/24-29, C7F/40-45, C10F/31-37). Findings of affect abnormalities are not consistent in the record, and she demonstrated appropriate grooming and hygiene, normal behavior, a logical and organized thought process, and the ability to sustain her attention span and concentration (C2F/70-77, C3F, C7F/24-29, C7F/40-45, C10F/31-37). Furthermore, she reported that she was able to prepare simple meals, perform household chores, manage her funds independently, drive, shop in stores, and focus sufficiently to watch television (C4E, C3F).

Nonetheless, functional limitations are warranted. To account for reports of deficits in concentration and racing thoughts, she was limited to understand, remember, and carry out simple instructions. To avoid exacerbating her symptoms with stress, she should perform work in a routine work setting with few, minor changes. Further, due to her noted issues with anger management and impulse control, noted mood abnormalities, and impairment of insight and judgment, she was limited to responding appropriate to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others, and the occupation does not require tandem work or interaction with the public.

(*Id.* at 34.)

The Court finds substantial evidence supports the ALJ's determination that Al-Maliki did not meet

or equal Listings 12.04 and 12.08.  First, Al-Maliki's argument is not well-taken, as counsel for Al-Maliki

told the ALJ this was "a case for Step 5, with the inability to sustain competitive employment."  (*Id.* at

18

47.)  Second, the ALJ thoroughly discussed the record evidence regarding Al-Maliki's mental impairments at Step Three and in his RFC analysis.  As the ALJ's decision and this Court's review of the record makes clear, the medical findings within the treatment records are mixed. The ALJ highlighted the mixed findings in the record, including those supporting a finding of disability.  (Tr. 29-35.)  The ALJ explained how he weighed the evidence and resolved any conflicts.  (*Id.*)  The Court agrees with the Commissioner that the evidence considered by the ALJ relating to the domain of adapting or managing oneself was within the examples specified in the regulation.  Furthermore, the state agency reviewing psychologists opined that Al-Maliki did not meet or equal a listing.  (*Id.* at 97, 105, 116, 125.)

The substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035. "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018). Here, the ALJ's Step Three findings that Al-Maliki did not meet or equal the requirements of Listings 12.04 and 12.08 is within that "zone of choice" and thus supported by substantial evidence.

## B.    Dr. Ratner's Opinions

Al-Maliki argues the ALJ erred in rejecting the opinions of Dr. Ratner, as they "were both supported by Dr. Ratner's treatment records and were consistent with the other evidence of record, including the marked limitations found by the state agency reviewing psychiatrists, despite the ALJ's conservative approach to this matter."  (Doc. No. 9 at 9.)  Al-Maliki accuses the ALJ of cherry-picking the evidence and "improperly minimiz[ing]" her subjective complaints.  (*Id.*)  In addition, Al-Maliki implies the ALJ erred in not basing the RFC on a medical opinion and in failing "to address the collective consistency of the opinion evidence in his failure to do so."  (*Id.* at 13.)

19

The Commissioner responds that substantial evidence supports the ALJ's evaluation of the opinion evidence. (Doc. No. 12 at 12.) The ALJ considered the factors of supportability and consistency and the ALJ's finding that Dr. Ratner's opinions were not supported by and were inconsistent with the record is supported by substantial evidence. (*Id.* at 13-15.) In accusing the ALJ of cherry-picking the evidence, Al-Maliki does the same and asks for this Court to reweigh the evidence in her favor, which the Court cannot do. (*Id.* at 16.) Finally, to the extent Al-Maliki argues the RFC is "flawed because it was not based on any specific opinion," the Sixth Circuit has rejected this argument. (*Id.*)

Since Al-Maliki's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr Ratner's opinions as follows:

> The State agency psychological consultants, Leslie Rudy, PhD and Janet Souder, PsyD, assessed that the claimant retained the ability to carry out one to four step tasks in a setting without demands for unusually fast pace or high production where she had occasional and superficial interactions with supervisors and coworkers in a nonpublic setting, no ability to tolerate close, over-the-shoulder supervision, and where she had the capacity to adjust to minor and infrequent changes in a work setting (C4A, C5A, C8A, C9A). The undersigned finds this assessment to be less persuasive as it is not altogether consistent with the findings outlined previously. To account for reports of racing thoughts and impairment in focus, limiting the claimant to no more than understanding, remembering, and carrying out simple instructions is supported. As outlined, a limitation for a routine work setting with few/infrequent changes is consistent with the need to avoid exacerbating her symptoms and impairment of insight and judgment. Additionally, while social interactions are supported by reports of anger management and impulse control problems and mood abnormalities, defining superficial interaction as outlined in the residual functional capacity above clarifies this limitation in vocationally relevant terms. Further, evidence of a cooperative presentation is not consistent with the need for no over-the- shoulder supervision (C2F/70-77, C6F/143-149, C7F/24-29, C7F/40-45, C10F/31-37). For these reasons, the assessment of Dr. Koricke lacks persuasiveness. While functional limitations are noted, the opinion relies on the claimant's subjective reports and fails to use vocationally relevant terms in discussing her abilities within a workplace setting. Nonetheless, a greater level of limitation than included in the residual functional capacity above is not supported by evidence of intact short-term and long-term memory, a logical and organized thought process, sustained attention span and concentration, and a cooperative demeanor (C2F/70-77, C3F, C6F/143-149, C7F/24-29, C7F/40-45, C10F/31-37). Finally, greater limitations are not consistent with the claimant's reported level of daily activities, to include the ability to drive, shop in stores, perform household chores, prepare meals, watch television, and manage her

> funds independently (C4E, C3F). For these reasons, the assessments of Dr. Ratner are less persuasive. While she had an established treating relationship with the claimant, the level of limitation alleged in the functional assessments she completed is not consistent with or supported by these findings, which include Dr. Ratner's own treatment notes.

(Tr. 35.)

Elsewhere in the RFC analysis, the ALJ noted the following findings that were unsupportive of disability, many of which came from Dr. Ratner's treatment notes:

- Full range of affect.

- Cooperative behavior.

- Adequate grooming.

- Logical and organized thought process.

- Intact memory.

- Sustained attention and concentration.

- Conservative treatment.

(*Id.* at 32-34.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ considered the supportability and consistency of Dr. Ratner's opinions, discussing evidence that was unsupportive of disability in the process.  (*Id.* at 32-35.)  It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Al-Maliki would weigh the evidence differently, it is not for the Court to do so on appeal.

While it is true that the ALJ did not discuss the consistency of Dr. Ratner's opinions with those of the state agency reviewing psychologists, to the extent that constituted error under the Revised Regulations, any such error is harmless.  *See Ingram v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-2692, 2022

23

WL 2237807, at *7 (N.D. Ohio June 22, 2022) ("Once the ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless.") (citing *Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 WL 4951763, at *——, 2021 U.S. Dist. LEXIS 204564, at *30 (N.D. Ohio Oct. 25, 2021); *DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176 (9th Cir. 2009)). "Thus, any shortcoming in the ALJ's compliance with 20 C.F.R. § 404.1520c in this case provides no basis for remand." *Id.*

Moreover, in rejecting Dr. Ratner's opinions and determining Al-Maliki's RFC, the ALJ did not rely solely on the nature and extent of Al-Maliki's activities of daily living, but also relied on the numerous normal examination findings in the record. *See e.g., Walker v. Comm'r of Soc. Sec.*, 2016 WL 692548, at *16 (S.D. Ohio Feb. 22, 2016) ("According to Plaintiff, the ALJ erred in relying on his activities of daily living because they fall short of establishing an ability to engage in full-time employment. Plaintiff's argument is unavailing because the ALJ did not rely exclusively on his activities of daily living in formulating his RFC or assessing his credibility. Rather, the ALJ properly considered Plaintiff's activities of daily living as one of several factors."); *Rodriguez v. Comm'r of Soc. Sec.*, 2017 WL 1362701, at *5 (E.D. Mich. Feb. 21, 2017) ("In this case, where the ALJ considered the relevant medical evidence—including Rodriguez's treatment notes and statements made to his physicians—as well as Rodriguez's activities of daily living, the Court finds that the ALJ acted squarely within his authority in determining Rodriguez's RFC.")

While the paragraph regarding the opinion evidence is not a model of clarity, in reading the ALJ's decision as a whole, as the Court must do, the Court can follow the ALJ's reasoning. A perfect opinion is not required. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law

or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

To the extent Al-Maliki argues the ALJ erred in not basing the RFC on a medical opinion, this Court reiterates the rule that an ALJ is not required to base the RFC determination on a particular medical opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d) ("The determination of an individual's residual functional capacity is an issue reserved for the Commissioner."); *Mokbel-Aljani v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a [RFC] determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."). *See also Rudd v. Comm'r of Soc.* Sec., 531 F. App'x 719, 728 (6th Cir. 2013) (explaining that requiring an ALJ to base an RFC determination on medical opinions would transfer the statutory responsibility to determine if an individual is under a disability from an ALJ to a medical source).

## C. RFC Analysis

In her final assignment of error, Al-Maliki argues the ALJ's RFC lacks the support of substantial evidence, as the ALJ found she had a marked limitation in interacting with others but still found her capable of interacting with supervisors and coworkers on a limited basis. (Doc. No. 9 at 17.) Al-Maliki maintains that a "*marked* limitation in this domain should not have limited the type of 'others' that are impacted, whether in public versus in the workplace." (*Id.* at 18) (emphasis in original). Al-Maliki states the ALJ "only dealt with the quality of interaction . . . but made a point to state that she could respond appropriately with coworkers and supervisors, so long as the work did not require her to work in tandem

25

with others or on more than superficial basis." (*Id.*) Al-Maliki also implies the ALJ further erred in rejecting the restriction of "'no over the shoulder' supervision" opined by the state agency reviewing psychologists based on "a 'cooperative presentation' to the exclusion of the wealth of evidence already cited that negates her ability to regulate her mood." (*Id.*)

The Commissioner responds that substantial evidence supports the mental limitations included in the RFC and the record does not warrant additional limitations. (Doc. No. 12 at 17.) The Commissioner argues the ALJ was not required to accept the limitation of "no over the shoulder" supervision after finding the opinions of the state agency psychologists less persuasive. (*Id.* at 18.) In addition, in contrast to Al-Maliki's argument that the ALJ cherry-picked the evidence, the decision as a whole makes clear the ALJ considered all the evidence and drew conclusions, as he was required to do. (*Id.*)

In the RFC analysis, the ALJ analyzed the state agency reviewing psychologists' opinions as follows:

> The State agency psychological consultants, Leslie Rudy, PhD and Janet Souder, PsyD, assessed that the claimant retained the ability to carry out one to four step tasks in a setting without demands for unusually fast pace or high production where she had occasional and superficial interactions with supervisors and coworkers in a nonpublic setting, no ability to tolerate close, over-the-shoulder supervision, and where she had the capacity to adjust to minor and infrequent changes in a work setting (C4A, C5A, C8A, C9A). The undersigned finds this assessment to be less persuasive as it is not altogether consistent with the findings outlined previously. To account for reports of racing thoughts and impairment in focus, limiting the claimant to no more than understanding, remembering, and carrying out simple instructions is supported. As outlined, a limitation for a routine work setting with few/infrequent changes is consistent with the need to avoid exacerbating her symptoms and impairment of insight and judgment. Additionally, while social interactions are supported by reports of anger management and impulse control problems and mood abnormalities, defining superficial interaction as outlined in the residual functional capacity above clarifies this limitation in vocationally relevant terms. Further, evidence of a cooperative presentation is not consistent with the need for no over-the- shoulder supervision (C2F/70-77, C6F/143-149, C7F/24-29, C7F/40-45, C10F/31-37).

(*Id.* at 35.)

26

First, findings at Step Three are not RFC findings.  20 C.F.R. Part 404, Subpart. P, Appendix 1, § 12.00A.  "That finding is formulated at step four, which 'requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C' of the Listings to be considered at step three." *Wood v. Comm'r of Social Sec.*, No. 19-1560, 2020 WL 618536, at *3 (6th Cir. January 31, 2020) (citing SSR 96–8p, 1996 WL 374184, at *4 (July 2, 1996)).

Second, as this Court has previously explained:

> An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015). Rather, the ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

*Sharpe v. Comm'r of Soc. Sec.*, Case No. 1:20-CV-023732-PAG, 2022 WL 2610449, at *15 (N.D. Ohio Apr. 1, 2022), *report and recommendation adopted by* 2022 WL 2127960 (N.D. Ohio June 14, 2022). The undersigned is able to trace the path of the ALJ's reasoning regarding the social interactions in the RFC.

Elsewhere in the opinion, as discussed in detail above, the ALJ noted findings inconsistent with disability.  (*Id.* at 32-35.)  Again, it is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Al-Maliki would weigh the evidence differently, it is not for the Court to do so on appeal.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: December 14, 2023                                    *s/ Jonathan Greenberg*
                                                           Jonathan D. Greenberg
                                                           United States Magistrate Judge